F6iggurc

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  GURUM CORPORATION,

4              Plaintiff,

5        v.                          15 Civ. 4614 (KPF)

6  STEPHEN LIM, et al.,

7              Defendants.

8  ------------------------------x
                                    New York, N.Y.
9                                   June 18, 2015
                                    9:05 a.m.
10
   Before:
11
                  HON. KATHERINE POLK FAILLA,
12
                                    District Judge
13
                       APPEARANCES
14
   BRUCE LEVINSON
15      Attorney for Plaintiff Gurum Corp.

16 KIM & BAE
        Attorney for Defendant Stephen Lim
17 WILLIAM J. VOLONTI
   PETER MELAMED
18

19

20

21

22

23

24

25

F6iggurc

```
 1            (In open court)

 2            THE DEPUTY CLERK:  In the matter of Gurum Corporation

 3    v. Stephen Lim, et al.  Counsel, identify yourselves for the

 4    record, beginning with plaintiff.

 5            MR. LEVINSON:  For plaintiff, Bruce Levinson, 805

 6    Third Avenue, New York, New York.

 7            THE COURT:  Good morning, sir.

 8            MR. LEVINSON:  Good morning.

 9            MR. MELAMED:  For Stephen Lim, Peter Melamed.

10            THE COURT:  You're Mr. Melamed.

11            MR. MELAMED:  Yes.

12            MR. VOLONTI:  Bill Volonti from Kim & Bae on behalf of

13    Mr. Stephen Lim.

14            THE COURT:  I think I understand there's a

15    housekeeping matter you want to deal with first, which is that

16    Mr. Melamed wants to move today for pro hac vice admission of

17    Mr. Volonti, is that correct?

18            MR. MELAMED:  That is correct.

19            THE COURT:  All right.  That's fine.  Thank you very

20    much.

21            MR. VOLONTI:  Thank you.

22            THE COURT:  And Mr. Lim, might you be the third person

23    here?

24            MR. LIM:  Yes.  My name is Stephen Lim.

25            THE COURT:  Good morning, sir.  Thank you.  Please be
```

F6iggurc

1      seated.

2              Mr. Levinson, let's begin, please, with you telling me

3      what happened since we had that telephone conference two days

4      ago and in that conference, for those of you who were not on

5      it, I think we came to a mutual agreement that it made more

6      sense rather than do anything ex parte, that we would have a

7      shortened time frame to get people in here to see what could be

8      done.  Could you tell me, please, the efforts that you made

9      towards serving the parties and the fruits of those efforts.

10             MR. LEVINSON:  Sure.  All of the defendants were

11     served by Federal Express.  I have printouts from Fed-Ex

12     indicating that Mr. Lim was served on Tuesday, June 16.  I also

13     served Lucero Produce at two different addresses that I had for

14     them, and the papers were served mid-morning on June 16.

15     Mr. Lucero was served at his place of business and I believe

16     that my office filed an affidavit of service indicating that

17     service had been made.  I have not been contacted by anyone on

18     behalf of the corporate defendant nor have I heard from anyone

19     representing Mr. Lucero.

20             THE COURT:  So neither lawyer nor business person from

21     the Lucero corporate entity nor Mr. Lucero has reached out to

22     you, sir.

23             MR. LEVINSON:  That's correct.  And Mr. Volonti and I

24     traded a couple of phone messages yesterday.  We were unable to

25     reach each other, so we haven't had a chance to speak.

F6iggurc

1          THE COURT:  I received this morning, and I'm going to

2    talk to Mr. Volonti and Mr. Melamed about this in a moment, a

3    memorandum in opposition to your application.

4          Have you received a copy of that?

5          MR. LEVINSON:  I have been handed a copy of it.

6          THE COURT:  Have you had a chance to look it at?

7          MR. LEVINSON:  Briefly.

8          THE COURT:  Then I will talk to you about it a little,

9    but first let me talk to Mr. Volonti or Mr. Melamed, whoever

10   would like to speak to this issue.

11         MR. VOLONTI:  I'll speak it to it.

12         THE COURT:  Thank you.  I was handed this document

13   this morning.  Has it been filed on ECF?

14         MR. VOLONTI:  No, your Honor.  I finished it around

15   midnight and I'm not electronically proficient.  I brought a

16   hard copy.

17         THE COURT:  Was it emailed to chambers last night?

18         MR. VOLONTI:  It wasn't.  It should not surprise me

19   that I didn't see it when I came in this morning.  I apologize.

20   I did it the old-fashioned way.

21         THE COURT:  I did review it before taking the bench

22   this morning, so I have a sense of what it is, but I guess

23   perhaps we should talk about it, sir, because you're standing.

24         What I understand you to be suggesting is that the

25   Gurum Corporation or Mr. Young was involved in what might be

F6iggurc

described as labor law violations, and I understand that.  But
I'm not sure, are you arguing from there that the noncompete is
unenforceable because Mr. Lim worked under rather difficult
conditions?

          MR. VOLONTI:  Well, it's unenforceable for a number of
reasons.

          THE COURT:  Tell me, please, what each of them is,
sir.

          MR. VOLONTI:  Okay.  The reason why it should be
unenforceable is that because under the law, as it is, this is
the state law *Reed, Roberts Associates v. Strauman*.  It's a
decision from the New York Court of Appeals from 1976.  A
restrictive employment covenant will only be subjected to
specific enforcement to the extent it is reasonable in time and
area, not necessary to protect the employer's legitimate
interest, not harmful to the public, the general public, and is
not unreasonably burdensome on the employee.

          Let's take a look at this test and apply it to the
facts at hand, your Honor.  You have a prohibition against any
business activity in Bronx County for a full year.  In this
business, the wholesale sale of produce, fruits and vegetables,
Hunts Point is the name of the game.  The County of the Bronx
wasn't picked out of the air.  If he can't even do any business
in the county of the Bronx, he's really out of business because
that's where Hunts Point is.  That's where it says

F6iggurc

1    hundreds -- the Wikipedia article says there are probably tens

2    of thousands of people there involved in different food

3    services.  There's produce.  There's meat.  There's all kinds

4    of services like that.  So stopping him from doing that in the

5    Bronx is an unreasonable area restriction.

6           In addition, this is not a specialized field, like it

7    isn't like there's one ophthalmologist in Des Moines, Iowa, and

8    you open up an ophthalmology profession next to it and the guy

9    says go down the block.  This is a generalized business that

10   people can get into if they just file an application with

11   authorities and have knowledge with the business.  The

12   wholesalers and the distributors are all known.  They're all

13   people that are around.  There are no trade secrets here.

14   There is nothing that is confidential.

15          He has been working in the business for 13 years,

16   Mr. Lim, and has learned the general business.  The general

17   business is that you go out and know sources where you can get

18   avocados, where you can get mangos, and then you have retailers

19   or customers or purchasers who want to purchase them on a

20   lower-volume level.

21          THE COURT:  Sir, let me explain to you my concern, and

22   my concern is that Mr. Lim, according to plaintiff's submission

23   to me, upon leaving the employ of Gurum has -- it's one thing

24   to say it's not a business that requires a special skill, it's

25   not the one ophthalmologist in Des Moines as you suggested, but

F6iggurc

1    the fact is, the folks he's been reaching out to are the very

2    folks who were developed as clients for Gurum.  So it's not as

3    if he has divested himself of all of the knowledge he acquired

4    during the years of working with Mr. Young.  Instead, he seems

5    to be exploiting it for the benefit of Lucero Produce.

6          Am I mistaken, or let me put it this way:  Is the

7    plaintiff mistaken in his contention?

8          MR. VOLONTI:  He has his own business.  He doesn't

9    work with Lucero.  The only thing he did with Lucero is they

10   had an arrangement where it was -- somebody was sorting

11   avocados, he would supply avocados and stuff like that.  So

12   even though they're competitors in this business, people do

13   work out cooperative arrangements.  So with Lucero, he just

14   worked out a cooperative arrangement and he cut them a break

15   with either the avocados or the mangos and if some of them were

16   bad, so he gave an adjustment, which is a common business

17   practice in this industry.

18         He can find other purchasers.  The only thing he's

19   done is he's talked to a few people, but he's not gone and

20   defamed the Gurum Corporation.  He's not gone and said I'm

21   going to undersell them, do better with me.  This is an area

22   where everybody knows people and stuff like that.  He basically

23   went over there just to say, you know, I'm leaving, I left this

24   firm, I'm doing stuff like that, and I left the firm to talk to

25   a few clients and said I'm leaving, but I didn't take the

F6iggurc

1    clients with me.  But he's a professional and as a professional

2    courtesy, he went out and just told the customers that he was

3    moving on.  He's not trying to suck these customers or clients

4    out because there are many that he can get.  And he's not --

5          THE COURT:  But then I don't understand quite, sir,

6    the professional courtesy angle.  He could also have left

7    Gurum, gone on to his new venture and never reached out to or

8    explained his situation and his change in employment to these

9    customers.  So in saying I'm leaving and starting my own shop,

10   it wouldn't be crazy for the plaintiff to think that that was

11   in some way a solicitation of these entities.

12         MR. VOLONTI:  The agreement doesn't prohibit him from

13   soliciting anybody.

14         THE COURT:  No, but the agreement says -- first of

15   all, you're not suggesting that he did not understand what he

16   was signing, are you?

17         MR. VOLONTI:  He didn't understand what he was signing

18   in the affidavit.  And I can attest what he told me, back -- he

19   starts there in 2002.  In 2006, Mr. Young comes around with

20   this affidavit -- not the affidavit, with the restrictive

21   covenant and he says sign it or you can't work here, so

22   everybody signed it.  He didn't read it.  He didn't understand

23   it.  He didn't have an attorney review it.  And Mr. Young takes

24   the thing from him.  And then he leaves Mr. Young.  Mr. Young

25   doesn't want him to leave.  He tells Mr. Young on April 28 I

F6iggurc

1    want to leave.  Mr. Young tries to talk him back into staying.

2    He sends an email out saying I'm going to leave in Korean and

3    that doesn't work.  So he sends one out in English and he says

4    I'm leaving May 30 or 31.  And then Mr. Young comes and says

5    you're gone and slaps him with this.  Mr. Young never even sent

6    a cease and desist letter to him over anything.  The first

7    notice that he had there was any problem is when this lawsuit

8    arrived.  He didn't have a copy of the restrictive covenant.

9    Mr. Young apparently kept it at home.

10           THE COURT:  I want to stop you for a moment, sir,

11   because I'm not sure what you're saying when you're saying he

12   didn't read it.  You're saying he just signed because he

13   understood it to be a condition of his employment?

14           MR. VOLONTI:  Signed this.

15           THE COURT:  Then I'm basically rewarding him for not

16   having read it.  That's not great either.  Right now he can

17   read this; he understands what it says?

18           MR. VOLONTI:  He understood it, yes.  We went over it

19   with him in my office.

20           THE COURT:  And he's nodding to me now, so he

21   understands what it says.  The point was at that time in 2006,

22   it appears to be July of 2006, he simply signed it without

23   reading it.

24           MR. VOLONTI:  Correct.  His boss said, look, sign this

25   and he says to everyone you can't work here if you don't sign

F6iggurc

| | |
|---|---|
| 1 | it he wasn't anti his boss.  He wasn't antiboss.  His boss said |
| 2 | sign the thing, so he signs it.  He was a loyal employee. |
| 3 | THE COURT:  Okay.  But what he signed says:  Upon the |
| 4 | separation from my employment with Gurum Corp., I will not set |
| 5 | up my own business, comma, operate a business, comma, go to |
| 6 | work for, comma, become employed by another company that |
| 7 | distributes fruits and/or vegetables. |
| 8 | I have great difficulty understanding why someone |
| 9 | would sign something they did not read because he could have |
| 10 | been signing away his right to his salary, he could have been |
| 11 | signing away his firstborn.  You're suggesting he did not read |
| 12 | one word of this document. |
| 13 | MR. VOLONTI:  I don't believe he did.  People go to |
| 14 | the car rental at the airport and sign things without reading |
| 15 | and when you ask them can I read the thing, they say if you |
| 16 | want to step out of line and read it, go ahead. |
| 17 | THE COURT:  And I do, but perhaps that's the |
| 18 | profession that we're in.  The point is, I don't like the |
| 19 | notion that you're asking me to not enforce this agreement |
| 20 | because your client didn't have the good sense to read it. |
| 21 | MR. VOLONTI:  That's not the only reason, your Honor. |
| 22 | THE COURT:  I understand but your other reasons aren't |
| 23 | making me feel much better, so let's talk about them.  It's one |
| 24 | year, sir, so I think you're going to lose on the reasonable in |
| 25 | time.  What you're working with instead is the reasonable in |

F6iggurc

1    place.  And you're saying to say the Bronx is basically to say

2    the whole world.

3          MR. VOLONTI:  I think the intent is to drive him out

4    of business in a field where there are lots of people where

5    having one more competitor is not going to hurt Mr. Young or

6    his corporation.

7          If this gentleman goes out and does $50,000 worth of

8    business, it's not taking $50,000 away from Mr. Young.  It's

9    simply generalized business in a field where there are lots and

10   lots of fruits and vegetables being delivered.  So if he opens

11   up shop and says I left Gurum, here I am, it's not going to

12   take away from their business.  He's not stealing the client.

13         It's not like somebody is a tech guy and he's got IBM

14   as a client or he's got Hewlett-Packard as a client and you

15   steal Hewlett-Packard and take away 50 percent of the business.

16   This is largely a fungible business done by people who don't

17   have to have specialized college degrees.  They simply have to

18   have experience in the business.

19         What he's saying is you can't leave me, once you're

20   with me and you want to leave me, you're tired with me, you

21   want to do something else, you can't practice anywhere in this

22   business, in this area for a full year, and if you happen to

23   have kids, all the tough luck.  The hardship falls on him.

24         There's virtually no hardship that either has been

25   alleged or could be alleged by Mr. Young by having this man go

F6iggurc

1    out and open a fruits-and-vegetable-type business he's going to

2    be hurt it's almost like somebody being a vendor out on the

3    street selling peanuts and he has an assistant and there are

4    eight vendors in a certain area and he goes out and becomes a

5    vendor four blocks away.  You're really not taking away the

6    traffic of the one guy and saying come over here or don't deal

7    with Mr. Young.  He's saying, look, I had some customers, I

8    have this, that and the other thing, I have largely a fungible

9    type of business.

10          So there's been even no allegation that there's any

11    damages sustained by the plaintiff.  I don't think they could

12    prove any damages.  They say in their complaint that they have

13    damages they want to prove in the future.  They can't prove any

14    damages because there are none.

15          THE COURT:  You have seen, because I'm sure you've

16    seen the paperwork, that there is an affidavit from Mr. Young

17    and he recites, he avers under oath that there have been -- he

18    noticed financial irregularities and transactions.  And you may

19    say you disagree with them -- sir, you do have to let me speak

20    at this point.

21          You may say that they're explained and actually this

22    was a credit for rotting avocados or something like that, but

23    this is what I have.  I have something under oath telling me it

24    was more than that.  I'm told he was observed going into a

25    Lucero Produce's office.  I've been told he's been contacting

F6iggurc

numerous of our customers saying that he has left Gurum, he can

undercut our price and needs help in building his new business.

And they even recite the customers: Peña Produce, F&F Produce,

V&S Produce, Hamilton Meat Mart, Anthony Produce and Twin City.

There's a recital here that he's contacted most, if not all, of

our suppliers saying it's not merely that he's no longer

employed by us, but that they should do business with Mr. Lim

and they recites those as well.

So for you to -- sir, sir, let me speak.  For you to

say that there's no evidence of damages and no evidence of harm

and this is completely fungible, I understand your arguments,

but they are flying in the face of the allegations made by the

plaintiff and that's why we're here today.  I think it's a

little bit too simplistic to give me the view of the world that

you have given me.  I guess I need to hear a little bit from

Mr. Levinson, and then I'll hear again from you.  Thank you.

Mr. Levinson, I have been speculating about your

contemplated arguments, but I think I'd rather hear about them

from you, sir.

MR. LEVINSON:  Sure.

THE COURT:  You heard what has been said.  You've at

least had a chance to glance at the papers.  Please tell me

your client's views.

MR. LEVINSON:  Okay.  As set out in Mr. Young's

affidavit with great specificity down to not only the names of

F6iggurc

the companies who Mr. Lim is contacting, but the names of the
people at those companies who Mr. Lim's contacting, and I'm
referring specifically to paragraph 17 of Mr. Lim's affidavit.
He's not just competing, which he's not supposed to do, he's
competing unfairly.  It's a focused, specific attack on my
client's business, their suppliers and their customers.  So
it's interesting for me to hear my adversary say, oh, there's
all this business out there, everybody's at the Hunts Point
market, yet what's happening is Mr. Lim is contacting just my
client's suppliers and clients.

          Now, I have at 11:00 a conference in a matter
involving PACA and my client is based in Nassau County.
They're one of the biggest sellers of bananas in the New York
area.  So the Hunts Point market is not some sacrosanct place
where if you're not there, you can't do business.  I do a lot
of PACA work.  I have a number of clients in Brooklyn.  Red
Hook still has a number of businesses.  It's not just some red
hot residential area.  There are other areas of this city and
New Jersey and Rockland County where one can be in the produce
business.  So I think the agreement is reasonable.  It's nine
years old.  Mr. Lim has had nine years to disavow it.

          THE COURT:  Okay, but hang on.  Mr. Volonti is telling
me that Mr. Lim never had a copy of it.  He certainly glanced
at it, signed his name, handed it back and never saw it again,
so disavowing it would be an odd thing to suggest because that

F6iggurc

would suggest he had it around to look at.

          MR. LEVINSON:  Mr. Lim managed the company.  He was
the key employee.  He was the top executive of this company
under Mr. Young who owns it.  He is a sophisticated business
person.  He had access to all the records.  I'm hearing for the
first time he says, oh, he didn't have a copy, but again that
was at his peril.

          To use your example of you read what you get at the
rent-a-car line, it's not analogous because even if he didn't
understand it, he should have gotten a copy.  He had nine years
to do that.  He got all the benefits of having signed that,
including being paid handsomely over nine years, being
promoted, learning the business that he's now turned around and
he's using against my client.

          In his papers, he admits much of what is alleged here.
He admits that he set up his own company.  He admits that he's
contacted my client's customers and suppliers.  He admits going
to Lucero on the very date we say he went there, but he's got
this explanation that he was just helping them out, which I
think really strains credibility.

          So what my client's concern here is that their
business is being deliberately focused upon.  That is not fair
competition, even if this noncompete didn't exist.  And
Mr. Lim, as the key employee, is using not generalized
knowledge but the specific knowledge that he acquired during

F6iggurc

1   his tenure to focus an attack on my client.  It's not just, oh,

2   I'm not over here and I'd like to do business with you

3   sometime; it's he's calling Leo at Galactic and Nelson at

4   Tropical and Rodan at K&A and so on and so forth and saying oh,

5   no, no, don't do business with them, do business with me.

6        THE COURT:  Let me ask you this, sir:  If Mr. Lim had

7   decided to leave Mr. Young for any number of reasons and then

8   decided that what he would do is start afresh, perhaps focus on

9   a different segment of the produce market, speak to anybody but

10  these people, you still would be pursuing the enforcement of

11  the noncompetition agreement, correct?

12        MR. LEVINSON:  We would if that activity were in the

13  Bronx.  If he wants to go to Brooklyn, if he wants to go to

14  Rockland County, Long Island, then he can do what he wants,

15  again, as long as he's not using the knowledge that he acquired

16  during his tenure with my client for a period of one year which

17  the courts have said is reasonable.

18        I cite some cases in my memo that agreements of this

19  sort are certainly enforceable.  He admits that he copied the

20  business card that we attached is legitimate.  There's really

21  nothing that Mr. Young stated in his affidavit that's

22  contradicted.  I think the necessities for our getting

23  injunctive relief in this regard at this point have been shown.

24        THE COURT:  Let me ask you this.  There are two

25  concerns that I have about giving injunctive relief in this

F6iggurc

situation and one is, if one considers the issue of the balance

of the equities, what has been presented to me in, again, in

affidavit form at this time from Mr. Lim and not from Mr. Young

is that the Gurum Corporation was engaged in wide-scale labor

law violations, federal and state, so there is a suggestion

that I read in these papers that Mr. Lim was forced out, it

just became too much for him to deal with, and he began to

question, first of all, the hours that he worked and the pay he

received for those hours, but second of all, he began to

question the validity or at least the legitimacy of the

business dealings of Gurum.  Again, I just have the allegations

that I have, so I'm not weighing in on them, but that's sort of

where I am in this particular setting.

           So, shouldn't I consider his allegations of wage and

hour violations and what should I do with them?

           MR. LEVINSON:  I believe the answer is a resounding

no.

           THE COURT:  So he can bring his FLSA lawsuit if he

wants to.

           MR. LEVINSON:  Yes.  A lot of this is, in my view,

just an *ad hominum* attack which might be subject of a motion to

strike scandalous and prejudicial material.  I don't think it's

relevant.  A lot of the allegations go back to 2010 and 2011.

Again, I just looked at this very briefly.  But this, even if

it were true, I don't think it impacts on whether there was

F6iggurc

consideration for the agreement and it's all ameliorated by the

fact that he chose to stay.  He was promoted and he was given

check-signing authority.

THE COURT:  Was he a salaried employee on a weekly

basis or on an hourly basis?

MR. LEVINSON:  I don't know the answer to that.

THE COURT:  Let me ask the question differently.  Is

he subject to one of the exceptions under the New York Labor

Law such as the -- I believe there's an administrative

exception and an executive exception that I've seen in other

contexts where folks who are not paid hourly are nonetheless

not expected to be paid hourly because of the particular nature

of their work?

MR. LEVINSON:  I believe he was salaried and he was

the top executive of the company, so I don't believe that he

can find a haven in the New York Labor Law.  Again, he seems

able to retain counsel on very short notice.  None of this

became an issue until right now I think raises questions.

THE COURT:  Okay.  Under Rule 65(c), I believe it's

(c), I should consider at least the posting of a bond here.

And I know you're going to talk to me about PACA, but separate

and apart from whether and to what extent PACA either

ameliorates or exists in lieu of any bond requirement, that's

not going to help you here.  So I think there has to be a bond

set here if I grant this injunctive relief, so just keep that

F6iggurc

1      in mind.

2                  Do you disagree with me, sir?

3                  MR. LEVINSON:  I do not disagree with you.

4                  THE COURT:  We may haggle over the amount.  You may

5      say it's not necessary.  I know your other arguments about

6      PACA.  We'll talk about those later on when we get to the

7      second phase of this proceeding.

8                  MR. LEVINSON:  Fair enough.

9                  (Discussion off the record)

10                 (Recess)

11                 THE COURT:  Counsel, something happened and I'd be

12     happy to know what it is.  Mr. Levinson, please let me know.

13                 MR. LEVINSON:  Well, we're not looking to take work

14     away from either the Court or your clerks, however, counsel and

15     I have discussed the matter and we're prepared to put a

16     stipulation on the record which resolves the matter, the motion

17     as to Mr. Lim.

18                 THE COURT:  Excellent.  Please.

19                 MR. LEVINSON:  Mr. Lim consents to plaintiff's motion

20     as it applies to him solely to the following extent.  For a

21     period of one year from today, Mr. Lim will neither directly

22     nor indirectly solicit business from plaintiff's customers or

23     communicate with them or do business with them, and by directly

24     or indirectly that means Mr. Lim personally those under his

25     direction and those at his company.

F6iggurc

1          MR. MELAMED:  I heard all customers.  I didn't hear

2     anything about the specific customers that were --

3          MR. VOLONTI:  It's just the customers listed in

4     paragraph 16, isn't it?

5          MR. LEVINSON:  I thought we were --

6          THE COURT:  Go.

7          MR. LEVINSON:  Give us two minutes.

8          THE COURT:  Take five.  I want you to work this out if

9     it can be worked out.

10         (Recess)

11         MR. VOLONTI:  May it please the Court.  There's been a

12    settlement in the matter of Gurum Corp. v. Stephen Lim.

13         THE COURT:  And because Mr. Levinson didn't articulate

14    it correctly, you're going to take over?

15         MR. VOLONTI:  I'm going to take over the settlement

16    and then he's going to make sure I'm correct.

17         THE COURT:  Excellent.  I will hear from you then.

18    Thank you.

19         MR. VOLONTI:  May it please the Court, the settlement

20    that the parties have worked out is that Mr. Lim will have no

21    contact with the customers of the plaintiff for a period of one

22    year starting today; that Mr. Levinson will supply our firm Kim

23    & Bae a list of the customers by Monday; that Mr. Lim will have

24    no contact or solicit business from the suppliers of Gurum for

25    nine months from today.

F6iggurc

1          THE COURT:  Sir, I'm sorry.  This is just for my own

2    clarification.  You're distinguishing this list of customers,

3    which is a one-year prohibition, from the list of suppliers,

4    which is a nine-month prohibition?

5          MR. VOLONTI:  Yes, your Honor.

6          THE COURT:  Thank you for the clarification.  Please

7    continue, sir.

8          MR. VOLONTI:  Thank you.  So the prohibition on

9    contact with suppliers will last for a period of nine months

10   starting from today.  The definition of a customer or supplier

11   is anybody who has done business with Gurum in the fruit and

12   vegetable produce business from April 7, 2014 to May 7, 2015,

13   and it would be anyone who has done more than $1,000 worth of

14   business during that period of time.

15         Our client, Mr. Lim, will cooperate with the plaintiff

16   by either providing information about the business dispute

17   between Gurum and Lucero Produce and Saul Lucero, including an

18   affidavit if necessary and also appear in court if necessary

19   without the need for the issuance of a subpoena.

20         There is an agreement that there will be no

21   disparagement by either side.  Gurum Corporation has

22   specifically agreed that Mr. Young will not post things on

23   Korean social media accusing him of theft or anything related

24   of that nature.

25         Is the anything I left out?

F6iggurc

1              MR. MELAMED:  First of all, I don't recall if it was

2      mentioned that the customer list will be provided by Monday.

3              MR. VOLONTI:  Yes.  I said that.

4              MR. MELAMED:  And that that would remain confidential.

5              THE COURT:  He did get that.

6              MR. MELAMED:  Okay.  Thank you.

7              THE COURT:  Mr. Levinson, anything you'd like to add?

8              MR. LEVINSON:  Just one small addendum, I believe I

9      put it on the record before, that the prohibition against

10     communication applies to Mr. Lim and also anybody under his

11     control and agents and so forth.

12             MR. VOLONTI:  So stipulated.

13             THE COURT:  That's great.  Will this suffice as the

14     agreement or do the parties intend to put it in paper?

15             MR. LEVINSON:  I think this will suffice.

16             THE COURT:  Let me ask this question:  I'm assuming

17     that at least for the next week or so, you want me to keep

18     jurisdiction as to Mr. Lim in case something happens with the

19     ability to get these terms in order.

20             MR. LEVINSON:  Yes.  That would be appreciated.

21             THE COURT:  And what about after that for the one-year

22     and the nine-month periods?

23             MR. LEVINSON:  Well, there's the underlying case.

24             THE COURT:  Yes.  We're going to talk about that in a

25     moment.  I just want to know whether these folks can leave.

F6iggurc

1          MR. LEVINSON:  We're not discontinuing the case.  I am

2     hopeful that this will resolve everything and that money will

3     not need to change hands, but I don't want to discontinue the

4     matter as to Mr. Lim at this point so that the names will

5     remain.

6          THE COURT:  I am confused.  I'm sorry.  What I

7     understood was happening was that at some point, and we'll talk

8     about when that point is, that the matter would be discontinued

9     as to Mr. Lim and that the thought would be that I would retain

10    jurisdiction for the next year for the purpose of enforcing the

11    settlement that the parties have put on the record today.

12    That's the way these things usually work.

13          Were you contemplating something different?

14          MR. LEVINSON:  That's correct.  Upon the conclusion of

15    the year, assuming that there's no issues about the injunction

16    that's being stipulated to today, then the case would be

17    discontinued as to --

18          THE COURT:  See, that's -- again, now we're having

19    this problem, sir, because I don't want to keep the case on my

20    docket for a year if it's settled.  That's the concern I have.

21    So I'm fine if the parties settle this matter in this manner

22    and have me around for enforcement if, heaven forbid, one side

23    or the other violates this agreement.  But what I don't think I

24    want to do is to keep this case open for a period of one year

25    when this is the settlement of that piece of the case with

F6iggurc

respect to Mr. Lim.

          MR. LEVINSON:  As long as I can restore it if there is
an issue, then that's fine.  I'm not sure procedurally how you
want to handle it, but I'm fine with a discontinuance subject
to restoration if there's an issue.

          THE COURT:  Let me hear from the folks at the back
table.

          MR. VOLONTI:  I mean, we'd like to have it closed out
against Mr. Lim partly because in the community he doesn't want
to have an open civil case hanging over his head.  But if there
needs to be enforcement, we're not objecting to any mechanism
that the Court would put into place to allow either side to
enforce.

          THE COURT:  I guess I don't want to get academic here.
I really do want to understand it.  To my mind, the settlement
of the case means that if Mr. Lim were to violate, and of
course he's not going to, but if he were, there would be an
enforcement action that would involve how he violated it and
what damages flowed from that.  But I don't know that it always
results in a reinstitution or a revivification of the
underlying lawsuit.  If what you're saying, sir, because what
Mr. Levinson is asking for is for that, are you willing to
agree that this case goes back on; that that is something I can
consider as a means of enforcing the settlement of the case?

          MR. VOLONTI:  Yes.  I have no objection to reviving

F6iggurc

1 the case.  I'd like to have it at least formally dismissed at

2 this point so he can get this monkey off his back.

3    THE COURT:  Let me understand this:  Someone is going

4 to supply a list by Monday.

5    MR. VOLONTI:  Yes.

6    THE COURT:  When that list is supplied, things are

7 beginning, things are under weigh.  I will issue a 30-day order

8 at that time in case there are any hiccups in the first 30

9 days.  And I guess we're understanding that if there is a

10 violation on either side, one of the things I may consider

11 doing is reinstituting the case as to Mr. Lim and putting it

12 back on the calendar.

13    MR. VOLONTI:  Okay.

14    THE COURT:  Does that work, Mr. Levinson?

15    MR. LEVINSON:  That's fine.

16    THE COURT:  Mr. Volonti, that works?

17    MR. VOLONTI:  Thank you very much.

18    THE COURT:  Then my question remains, while we're

19 here, should we not talk about Lucero Produce?  And if we're

20 going to have that conversation, do the folks at the back table

21 need to continue to be here?

22    MR. LEVINSON:  No.  They're free to leave.

23    MR. VOLONTI:  Thank you for your Honor's time.

24    Mr. Levinson, thank you.

25    MR. MELAMED:  As a courtesy for Mr. Levinson, did you

F6iggurc

1  deal with the Eastern District matter?

2          THE COURT:  I believe we are in the process of doing

3  that.

4          MR. LEVINSON:  As I mentioned, when we spoke the other

5  day, I was supposed to be in front of Magistrate Mann at 11:00,

6  so if someone can possibly phone and say I'm not going to be

7  there --

8          THE DEPUTY CLERK:  It's my understanding there's a

9  case before the magistrate at 11:30.  I made a phone call and

10  spoke to somebody in chambers and told them that you would be a

11  little late.

12          MR. LEVINSON:  You're a gentleman and a scholar.

13          THE COURT:  Mr. Levinson, let's then proceed.

14          MR. VOLONTI:  Thank you.

15          THE COURT:  Let's proceed to the folks who are not

16  here, Lucero Produce.

17          MR. LEVINSON:  They have been given notice.  Three

18  different sets of papers were served between Lucero Produce

19  Corp. and its principal Mr. Lucero.  They have not remitted

20  trust funds.  They have bounced the check by virtue of stopping

21  payment on it which suggests that their money is going

22  elsewhere, that funds are being dissipated.  They may not have

23  sufficient funds to cover that check, and, of course, I think

24  under those circumstances, we're entitled to a restraint so

25  that further assets are not dissipated.  Congress has found

F6iggurc

1    that once PACA trust assets are dissipated, it's next to

2    impossible for them to be recovered.

3          THE COURT:  I have a couple of preliminary questions,

4    and the first is, is this very conversation that you and I are

5    having right now ex parte?  Because they have gotten notice and

6    they have not shown up, and so I don't know if this is a TRO

7    that happens to be on notice or something else entirely.

8          The reason we set up this morning's proceeding was to

9    give Lucero and Mr. Lim an opportunity to appear so we wouldn't

10   just have the ex parte discussion.  That's one question.  And

11   perhaps that's one of those academic questions that aren't

12   worth answering.

13         What I'm thinking about doing is issuing some form of

14   restraint with the understanding that it would be on the order

15   of a TRO with ten days for them to come in and do something

16   about it, and this will be their next chance to do something.

17   That is where I'm headed.  I'm not so sure, sir, that I will

18   impose the reporting or the disclosure requirements that are

19   sought in your order, although I think I'd have to require them

20   to have such materials present when next we all met.

21         MR. LEVINSON:  Yes.

22         THE COURT:  But on the issue of bond, let's assume,

23   sir, that I don't agree with your argument that PACA itself

24   provides the security that I need because I've seen at least

25   some cases, I saw one in the Eastern District of California

F6iggurc

1     from a few years ago suggesting that there was still a need for

2     a separate surety.

3                 I don't know what to say on these facts.  I'm not

4     sure -- what you're really asking is for an order that

5     basically enjoins Lucero from dissipating its accounts,

6     basically spending the money it has unless of course it has

7     enough to cover your debt.

8                 MR. LEVINSON:  Right.  Right, because they're spending

9     the plaintiff's money.

10                THE COURT:  Right.  As a practical matter, sir, how is

11    this order going to work?  You'll serve it on them but you've

12    already seen their responsiveness to things that you serve on

13    them.

14                Will you serve it on their banks?  Do you know what

15    banks they have?

16                MR. LEVINSON:  Yes, I do.  It's on the bad check,

17    assuming they still have that account.

18                THE COURT:  So you'd serve the order on the bank.

19                MR. LEVINSON:  Yes, I'd serve the order on the bank.

20                THE COURT:  To basically get them to stop.

21                MR. LEVINSON:  Right.  And it will disclose to me

22    whether this is a viable entity or whether they are bouncing

23    checks all over town and what inevitably there ensues is a

24    discussion.  I am contacted by an attorney or a principal.  In

25    practice, this is how it works.  And they either say no, we

F6iggurc

never got the shipment or we had a USDA inspection.  And then

there's colloquy.

I'm not aware of any inspection in this case.  I was

told affirmatively by my client that there was none, that there

was no dispute of this shipment as to quality, timeliness,

price, anything else.

THE COURT:  What is the issue then that your former

adversaries were just talking about regarding a credit because

of a problem with some of the other avocados?  Were you aware

of that before this proceeding.  Do you think that is, in fact,

correct?

MR. LEVINSON:  The way it works is that if there is a

problem, the USDA is onsite and they will inspect and they

issue an inspection report, and they will tell you, yes,

there's 12 percent discoloration, 12 percent, whatever it is,

and then the USDA also has a directory of market prices.  So

there will be a certain discount and 99.9 percent of disputes

get resolved in that way as a result of the inspection.  If

not, then an aggrieved party has the right to file what's

called an informal with the USDA where they essentially ask for

mediation.  They ask for an opinion letter, as it were.

Or you can get more serious.  You can file what's

called a formal, which is an administrative proceeding where

you go the administrative route as opposed to the traditional

route, judicial route, and things get resolved that way, and

F6iggurc

1     you have a right to come here and litigate, but that doesn't

2     happen very often but there are standard practices in the

3     industry for dispute resolution with the inspection by the USDA

4     being almost de rigeur.  If you don't want to pay the fee for

5     the inspection, then sometimes you go to what's called price

6     after sale where the shipper will say, all right, you say it's

7     no good, sell it, get the best price you can and, again, you're

8     guided by the USDA spot prices, and we'll give you an eight

9     percent margin and then you remit the balance to us, and that's

10    always confirmed in emails back and forth.

11            I asked my client multiple times, are there any emails

12    here, did you get any letters, faxes, any kind of communication

13    at all?  And the answer was no.  And I think the fact that the

14    defendant wrote a check, albeit one they stopped payment on,

15    would tend to show that they acknowledge the debt.  There's a

16    dispute on price.  Again, I asked my client about that.  There

17    is zero communications challenging this in any way, and the

18    fact that there is no inspection, I think it's a matter of

19    public record.

20            THE COURT:  Okay.  The proposed order that you have

21    given to me, I'm going to ask you, at your convenience, to

22    email it to chambers because I think we'd like to work on the

23    verbiage.

24            MR. LEVINSON:  Okay.

25            THE COURT:  I'm asking you because at the moment, you

F6iggurc

1    have more PACA experience than, well, I imagine most of the

2    judges in this district.  How perfunctory or how routine is an

3    order of the type that you sent to me, because the request for

4    disclosure of information about financials I found to be

5    aggressive.

6         MR. LEVINSON:  PACA is a very strong statute.  I tell

7    people about it.  I say, you know, it trumps federal tax liens

8    and they look at me like I have two heads.  None of these funds

9    are the asset of the defendant, so there's nothing to attach.

10   The feds can't come in and say, all right, you owe taxes.

11   Congress has said we need to protect farmers and growers

12   because if they're not paid right away, there are pretty

13   hellacious consequences.

14        THE COURT:  Again this is a routine order?

15        MR. LEVINSON:  I get these all the time.  This is my

16   stock form.

17        THE COURT:  Okay.

18        MR. LEVINSON:  And you will, if you ask around, you

19   will see that I haven't changed the word and I have had to post

20   maybe one bond in 15 years on this because, again, we're

21   talking about trust funds and the language of the statute is

22   very, very powerful.  I'm not particularly here with a bounced

23   check, a bond is not going to protect the defendant in any way.

24   What they do is they come in right away and they say, all

25   right, we're either paying or we have sufficient funds, but we

F6iggurc

1    are challenging this for some reason.  We're not going out of

2    business.  And here are bank statements.  We're paying our

3    bills in the ordinary course and that's what the requirement of

4    the document production on an expedited basis accomplishes.

5          THE COURT:  All right.  As I'm talking to you, I'm

6    looking at Rule 65(c), and it says I may issue a preliminary

7    injunction or temporary restraining order only if the movant

8    gives securities but then the parties -- in an amount that the

9    Court considers to pay the cost of damages by any party found

10   to have been wrongly enjoined or restrained, and then the

11   United States is excepted.

12         It seems to me that if we're going to meet again in

13   ten days, there really aren't going to be that many damages

14   that they're going to incur.  More than that, I'm understanding

15   that on two day's notice, they could move to dissolve this very

16   thing.

17         MR. LEVINSON:  They can.

18         THE COURT:  So there's even less in the way of

19   quantifiable damages.

20         MR. LEVINSON:  Right, and I'm fine with your schedule.

21   Ten days, I'm amenable to that.

22         THE COURT:  We will find some time in the next ten

23   days, actually I should ask Mr. Lopez while I'm here, what have

24   we got?

25         THE DEPUTY CLERK:  Ten days I think takes us to Sunday

F6iggurc

1    the 28th, but we may be available on Monday the 29th.

2              (Pause)

3              THE DEPUTY CLERK:  Friday the 26th, 11:30 a.m.

4              MR. LEVINSON:  That's fine with me.

5              THE COURT:  All right.  Mr. Levinson, can you arrange

6    to have this order emailed to my chambers?

7              MR. LEVINSON:  I'll certainly do that.

8              THE COURT:  And promptly, upon receiving it, we'll

9    fill in the information and get it docketed as soon as

10   possible, and then you'll have the electronic version to serve

11   on Lucero.

12             MR. LEVINSON:  Terrific.

13             THE COURT:  We hope to see them in two weeks.

14             MR. LEVINSON:  Much appreciated.

15             THE COURT:  Anything else to do today, sir?

16             MR. LEVINSON:  That's it.

17             THE COURT:  Thank you.  And we'll go off the record.

18             (Discussion off the record)

19             (Adjourned)

20

21

22

23

24

25